# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

v.

DANIELLE FAUX

No. 3:14-cr-28 (SRU)

## RULING ON MOTIONS TO SUPPRESS

Danielle Faux has been charged with health care fraud, in violation of 18 U.S.C. § 1347,

obstruction of a federal audit, in violation of 18 U.S.C. § 1516, filing a false statement on a tax

return, in violation of 26 U.S.C. § 7206, and aiding and abetting under 18 U.S.C. § 2.  *See*

Superseding Indictment (doc. # 21).  On September 23, 2014, Faux filed a motion to suppress

(doc. # 37), seeking suppression of evidence discovered as a result of a search of her home and

business pursuant to warrants executed on December 8, 2011.  In that motion, Faux also

requested a *Franks* hearing, a bill of particulars, an order requiring the government to comply

with its *Brady* obligations, and dismissal of the Superseding Indictment's forfeiture allegation.

On January 7, 2015, I held oral argument and took that motion under advisement (doc. # 64).

On December 9, 2014, Faux filed a motion to suppress statements made during an

interview with agents on December 8, 2011 (doc. # 58).  On December 22, 2014, Faux filed a

motion for in camera review of the grand jury minutes and dismissal of the Superseding

Indictment (doc. # 59).  I held oral argument on January 20, 2015 and took those motions under

advisement (doc. # 73).[1]  On March 16, 2015, I issued a ruling denying Faux's requests for a bill

of particulars, an order requiring the government to comply with its *Brady* obligations, and

---

[1] At oral argument on January 20, 2015, I requested the government to provide copies of all grand jury subpoenas issued on or before December 8, 2011 and a list of all witnesses who had testified or were scheduled to testify before the grand jury as of that date.  The government has since complied with that request (doc. # 79).

dismissal of the Superseding Indictment's forfeiture allegation, as well as her motion for in camera review of the grand jury minutes and dismissal of the Superseding Indictment (doc. # 96).  In that ruling, I indicated that a separate ruling would issue to address Faux's motion to suppress evidence and request for a *Franks* hearing (doc. # 37) and motion to suppress statements (doc. # 58).  For the following reasons, the motion to suppress evidence and request for a *Franks* hearing is DENIED, and the motion to suppress statements is GRANTED.

## I.  Background[2]

Danielle Faux is a physical therapist licensed to practice in Connecticut.  Since approximately August 2007, she has owned and operated Danielle Faux PT, LLC, a physical therapy practice located in Norwalk, Connecticut.  At all times relevant to the Superseding Indictment, she was also a part owner of Achieve Rehab and Fitness, a gym located in the same building as her physical therapy practice.  Faux was a participating provider in the Medicare program and a participating provider with Anthem Blue Cross Blue Shield and Aetna health care plans (collectively, "the insurance companies").

As part of their treatment, Faux referred some of her physical therapy patients to personal trainers for personal training sessions at Achieve.  If Faux referred a client to a personal trainer, the client would either purchase a personal training "package" through Achieve or pay Faux for the sessions and have Faux pay the trainer directly.  Only physical therapy services provided by a licensed physical therapist are covered by Medicare and the insurance companies.  Personal training services provided by non-licensed personal trainers are not covered by insurance.

---

[2] This ruling assumes the parties' familiarity with the facts outlined in my previous ruling (doc. # 96).  These additional facts are drawn from the materials submitted in connection with the pending motions and the testimony at the January 20, 2015 hearing.

A.  Healthcare Fraud Investigation

In or about June 2010, a personal trainer who had worked extensively with Faux (hereinafter "CW-1") voluntarily approached the government and met with agents from the Federal Bureau of Investigation ("FBI") and U.S. Department of Health and Human Services, Office of the Inspector General ("HHS-OIG").  CW-1 informed the agents that Faux was engaging in a scheme to defraud Medicare and private insurance companies by billing personal training sessions as physical therapy services provided by a licensed physical therapist.  CW-1 said that the services actually were rendered in the gym area at Achieve, not in Faux's physical therapy offices, and that the services were not supervised by Faux or her staff.  *See* McPhillips Aff. ¶ 20 (doc. # 37-4).

At that time, CW-1 had worked with Faux for several years – as a business partner at Formula for Fitness from 2004 until 2007 and in a reduced capacity after Faux moved her physical therapy practice to Achieve.  *Id.* ¶ 21.  CW-1 claimed that Faux began billing personal training sessions as physical therapy while they were business partners at Formula for Fitness.  Approximately six to eight months before she approached the government, CW-1 overheard a patient telling a trainer that she would have to stop training because her Medicare coverage was about to run out.  *Id.* ¶¶ 22-24, 37.  CW-1 knew that Medicare did not cover personal training sessions and believed that Medicare limits should not have affected the patient's ability to pay for personal training.  *Id.*

CW-1 stated that personal trainers at Achieve typically were compensated in one of two ways.  Achieve paid personal trainers approximately $20 per half-hour session ($40 per hour) to train clients who purchased packages through Achieve, and trainers would submit weekly "Request for Pay" sheets to Achieve in order to get paid.  Alternatively, personal trainers could

generate their own clients and charge those clients an amount that they deemed appropriate, but had to pay Achieve a $15 fee in order to do so. *Id.* ¶¶ 25-26.

CW-1 explained that trainers were paid differently for clients referred by Faux. Trainers tracked their sessions with those clients in a blue binder known as the "P.T. Log Book" kept in the training room at Achieve and submitted "Request for Pay" sheets directly to Faux – not Achieve. Faux would then send a check to the trainer from the bank account for Danielle Faux PT, LLC. Faux paid trainers between $35 and $45 per half-hour session – significantly more than Achieve paid trainers for the same services. *Id.* ¶¶ 25-32.

The agents did not perceive a legitimate reason for Faux to sell personal training packages to patients, because insurance did not cover personal training sessions.[3] As a result, the government commenced an eighteen-month investigation into Faux's business and billing practices. Shortly after speaking with CW-1, the government began issuing grand jury subpoenas to obtain Faux's billing and financial records. The government also put a wire on CW-1 and recorded numerous conversations between CW-1 and Faux, and between CW-1 and several of Faux's patients. Finally, the government had an undercover agent obtain physical therapy services at Faux's practice in order to confirm CW-1's statements and glean additional information about Faux and the practice.

The government's investigation revealed several instances where Faux billed insurance for providing physical therapy on days when it appeared likely that the patient had not received physical therapy, but had seen a personal trainer. *Id.* ¶¶ 48, 70-71, 78-80. On December 7, 2011, FBI Special Agent Matthew McPhillips, a licensed attorney, submitted an application for

---

[3] Faux asserts that she had legitimate reasons for selling personal-training packages to clients. In most cases, she retained a small portion of what she charged the client. In a few cases, Faux would not charge the client for the personal training services at all and would pay the trainer out of pocket, but that practice was also legitimate; it was a nominal expense and helped build good will with the client. Mem. Supp. Omnibus Mots. 8 (doc. # 37-2).

search warrants for Faux's home and business, and Magistrate Judge Holly B. Fitzsimmons issued the warrants.

    B.  <u>Execution of the Search Warrant and Interrogation at Faux's Residence</u>

Agents executed the warrants at Faux's home and business on the morning of December 8, 2011. Approximately ten to fifteen agents from three agencies – the FBI, HHS-OIG and the Criminal Investigations Division of the Internal Revenue Service ("IRS-CID") – arrived at Faux's home early that morning, just as the sun was coming up. Hr'g Tr. 11, 51-52, Jan. 20, 2015 (doc. # 84). Upon arriving at the house, they observed Faux's husband, Nicholas Corwin, in the driveway putting suitcases in the car. *Id.* at 11, 53. Faux and Corwin were about to leave for a vacation to Mexico with Corwin's son and his family. Faux Aff. ¶ 4. The agents approached Corwin, identified themselves and told Corwin that they were there to execute a search warrant. Hr'g Tr. 12.

The agents entered the house through a door between the garage and the main front door. *Id.* at 13. Faux was at the end of the hallway, fully dressed and carrying luggage. *Id.* at 14, 54. McPhillips and HHS-OIG Special Agent Lucille Fontes, who were designated to interrogate Faux during the search, approached Faux and informed her that they had warrants to search her residence and her physical therapy practice. *Id.* at 8, 19. McPhillips and Fontes told Faux that they wanted to speak with her about the use of personal trainers in the operation of her physical therapy practice. *Id.*; Faux Aff. ¶ 5. Faux replied that the use of trainers was entirely separate from her physical therapy practice. Hr'g Tr. 15. McPhillips "responded very bluntly, very directly, back to her in a manner in which she would understand that I didn't believe what she was telling me." *Id.*

Faux informed the agents that she was about to leave for vacation. *Id.* at 16, 75. According to Faux, McPhillips replied that she was "not going anywhere." Faux Aff. ¶ 6.

McPhillips denied making that statement, and testified that he did not tell Faux to cancel her plans or make any such threats.  Hr'g Tr. 15-17.  But it is undisputed that both agents heard Faux inform Corwin that their vacation would be cancelled, because the agents were there to discuss the "crossover" of the businesses, and neither agent informed Faux that there was no need to cancel or postpone her trip.  *See id.* at 16, 55.

      McPhillips and Fontes were dressed in business attire, but many of the agents executing the warrant were wearing jackets that identified them as law enforcement.  *Id.* at 9-10, 52.  McPhillips and Fontes were both carrying a weapon, but neither had occasion to draw their weapon while at Faux's residence.  *Id.*  Nevertheless, Faux knew or believed that most, if not all of the agents present at her home were armed.  Faux Aff. ¶ 5.

      The agents questioned Faux in the dining room.  Hr'g Tr. 55.  Faux asserts that they escorted her to the dining room and that one of the agents held her arm.  Faux Aff. ¶ 7.  Fontes, by contrast, testified that Faux went on her own volition; the agents did not escort or otherwise touch her.  Hr'g Tr. 55-56.  While Faux was in the dining room, Corwin was questioned by agents in the living room and was told to remain there for his and the agents' safety.  Faux Aff. ¶ 7; Hr'g Tr. 18, 56.  The agents did not give Faux the option to be in the same room as Corwin; Fontes testified that it is customary to separate witnesses during interrogations.  Hr'g Tr. 73.

      The agents questioned Faux for approximately two hours.  *Id.* at 19-20.  Fontes sat next to Faux at the dining room table and McPhillips sat directly across from Faux.  *Id.* at 18-19.  McPhillips asked most of the questions and Fontes took notes.  Fontes only asked Faux about the KX Modifier, a billing device that allows physical therapists to bill Medicare for certain

"reasonable and necessary" physical therapy services over and above the generally applicable cap.[4]  *Id.* at 77; Mem. Supp. Omnibus Mots. Ex. 4 (doc. # 37-6).

Faux was not permitted to freely move about her home during the execution of the search warrant.  Hr'g Tr. 20-21, 58.  When she was cold, Fontes accompanied Faux to her bedroom to get a sweater.  Faux Aff. ¶ 10.  When she needed to use the bathroom, Fontes accompanied her and stood outside the door.  *Id.* ¶ 9.  The agents also took Faux's cell phone from her.  *Id.* ¶ 8.  The agents testified that the restrictions on Faux's movement and ability to communicate were for officer-safety and evidence-preservation purposes, but there is no indication that Faux was ever informed of those rationales.  *See* Hr'g Tr. 22, 39, 59.

Both agents testified that the tone of the questioning was conversational and that they did not raise their voices at Faux.  *Id.* at 22, 40, 60.  McPhillips opined that Faux seemed calm and comfortable answering questions and, at one point, even joked with the agents.  *Id.* at 20-21, 24, 61.  Fontes, however, testified that Faux appeared "worried."  *Id.* at 56, 68.  Faux's sworn affidavit indicates that she felt threatened, scared and intimidated by the agents and did not think she was free to leave.  Faux Aff. ¶ 8.  Both agents testified that Faux never expressed a desire to terminate the interrogation and that she would have been free to leave the residence if she had asked.  Hr'g Tr. 40, 70.

It is undisputed that Faux did not receive *Miranda* warnings at any point before or during the two-hour interrogation.  Faux was never informed that her participation was voluntary, that she did not have to answer questions, or that she was free to leave.  McPhillips did not inform

---

[4] The Superseding Indictment charges Faux with falsely billing Medicare using the KX modifier.  From January 2007 until July 2011, Faux apparently used the KX modifier on 98% of her claims submitted to Medicare.  The KX modifier should not be used for most medical conditions, and routine use of the KX modifier often will prompt an inquiry by Medicare.  Faux was chastised – although not sanctioned – for overuse of the KX modifier during a 2009 Medicare audit and claimed during the interrogation that she had used the KX modifier less frequently since the audit.  Whether or not that is true, it is difficult to evaluate the validity of Faux's use of the KX modifier without information about the conditions suffered by her Medicare patients.  Nothing in this ruling turns on the allegations regarding Faux's use of the KX modifier.

Faux that she was not in custody until approximately twenty minutes after the questioning

commenced. *Id.* at 23, 30, 35, 68; Faux Aff. ¶ 8. McPhillips left the room several times during

the interrogation to take phone calls and check in with the search team. Hr'g Tr. 20; Faux Aff. ¶

11. Faux's affidavit states that McPhillips' behavior concerned her and caused her to ask him

whether she needed a lawyer. Faux Aff. ¶ 11. According to Faux, McPhillips responded "not

yet." *Id.* Both agents testified that McPhillips never made that statement, and both denied that

Faux asked whether she needed a lawyer. Hr'g Tr. 24-25, 62.

Faux was not placed under arrest at the end of the interview. She was, however, served

with a grand jury subpoena, directed to Faux as the custodian of records for her physical therapy

practice. *Id.* at 27. Assistant U.S. Attorney David Sheldon had prepared several grand jury

subpoenas for witnesses and records, which were served on various Achieve employees and

some of Faux's patients at or around the time of the search. Faux was not given a target letter on

December 8, 2011.

**II. Discussion**

The pending motions seek: (1) suppression of evidence discovered during the execution

of the search warrants and a *Franks* hearing to test the validity of the warrants; and (2)

suppression of statements that Faux made during the interview with McPhillips and Fontes at her

home on December 8, 2011. Each of those issues is discussed, in turn.

A. Motion to Suppress Evidence Discovered During Execution of the Search Warrants

The Fourth Amendment prohibits "unreasonable searches and seizures" and provides that

"no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and

particularly describing the place to be searched, and the persons or things to be seized." U.S.

Const. amend. IV; *United States v. Falso*, 544 F.3d 110, 117 (2d Cir. 2008). Probable cause is "a

fluid concept . . . not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v.*

*Gates*, 462 U.S. 213, 232 (1983); *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (citing *Gates*). As a result, the Supreme Court has adopted a flexible totality-of-the-circumstances approach for determining probable cause.  *Gates*, 462 U.S. at 231, 233.

The probable-cause inquiry focuses on "'probabilities,' not 'hard certainties,'" and the government need not make a prima facie showing of criminal activity in order to establish probable cause.  *Gates*, 462 U.S. at 231-33, 238; *see also United States v. Martin*, 46 F.3d 68, 74 (2d Cir. 2005) (noting that the probable-cause determination "is not overly strict").  An issuing judge need only "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Gates*, 462 U.S. at 238.  Nevertheless, "[s]ufficient information must be presented to the magistrate [judge] to allow that official to determine probable cause; [her] action cannot be a mere ratification of the bare conclusions of others."  *Id.* at 239.

"A reviewing court must accord substantial deference to the finding of an issuing judicial officer that probable cause exists."  *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993) (internal citations omitted).  "[T]he duty of a reviewing court is simply to ensure that the magistrate [judge] had a 'substantial basis for . . . conclud[ing]' that probable cause existed."  *Gates*, 462 U.S. at 238-39 (citing *Jones v. United States*, 362 U.S. 257, 271 (1960)).

Faux asserts that the warrants were invalid, because the affidavit submitted by Special Agent McPhillips failed to support a finding of probable cause to search either her home or her business.  Faux further contends that she is entitled to a *Franks* hearing, because the government intentionally omitted exculpatory information from and mischaracterized information in the affidavit.

9

1.   *Validity of the Warrants*

Faux asserts that the affidavit supporting the warrants failed to establish probable cause, because CW-1 was unreliable and the government therefore could not use CW-1's statements to support probable cause.  Faux contends that CW-1 lacked sufficient knowledge of both Faux's billing practices and her patients' physical therapy and training schedules to make claims about what she billed for and when.  Faux further indicates that CW-1 was motivated to fabricate the allegations against her: CW-1 openly disliked Faux and hoped to obtain a "financial windfall" by filing a *qui tam* complaint against Faux on December 6, 2011.  Mem. Supp. Omnibus Mots. 13.

When an affidavit in support of a search warrant is based on information obtained from a confidential informant, "courts assess the information by examining the totality of the circumstances bearing upon its reliability."  *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000) (internal citations omitted); *see also Wagner*, 989 F.2d at 72 (noting that the "core question" in assessing probable cause is whether the information provided by an informant is reliable).  The "veracity" and "basis of knowledge" of the person supplying the information are key aspects of the totality-of-the-circumstances analysis.  *Gates*, 462 U.S. at 238-39; *see also, e.g.*, *McColley v. Cnty. of Rensselaer*, 740 F.3d 817, 823 (2d Cir. 2014) (internal citations omitted).

"Information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of providing reliable information, or if it is corroborated in material respects by independent evidence."  *Wagner*, 989 F.2d at 72-73.  The Second Circuit has recognized that "informants do not all fall into neat categories of *known* or *anonymous*" and has described the level of corroboration required as a "sliding scale."  *United States v. Elmore*, 482 F.3d 172, 181 (2d Cir. 2007) (analyzing reasonable suspicion but

10

indicating same applies for probable cause).  Where the informant is "known from past practice to be reliable," little, if any corroboration may be necessary.  *Id.*  Where an informant is completely anonymous, by contrast, significant independent corroboration typically will be required.  *Id.*  An informant whose identity is known but whose reliability has not been verified falls somewhere in between, generally requiring more corroboration than a known reliable informant, but less than one who tips off the police anonymously.  *See id.*; *see also Gates*, 462 U.S. at 233 (noting that deficiencies in either "veracity" or "basis of knowledge" "may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability").

Meeting with the police in person is a positive indicator of reliability; a face-to-face encounter both permits an officer to assess credibility and, more importantly, increases the ability to hold the informant accountable if the information provided turns out to be false. *Elmore*, 482 F.3d at 180 (citing *Florida v. J.L.*, 529 U.S. 266, 270 (2000)); *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (same); *Canfield*, 212 F.3d at 719.  That is particularly true where the informant is an innocent bystander to the criminal activity, "with no apparent motive to falsify."  *Panetta*, 460 F.3d at 395 (citing *Caldarola v. Calabrese*, 298 F.3d 156, 163 (2d Cir. 2002)).

In evaluating whether an informant's statements are sufficiently corroborated, the court may examine the information provided about a suspect's innocent activities, in addition to statements about her allegedly criminal conduct.  *United States v. Gagnon*, 373 F.3d 230, 235 (2d Cir. 2004); *see also Gates*, 462 U.S. at 244 n.4 ("[I]nnocent behavior frequently will provide the basis for a showing of probable cause.").  Once a tip is sufficiently corroborated, the court may "reasonably infer that the remaining, unverified information is also true."  *Elmore*, 482 F.3d

11

at 180 (citing *Gates*, 462 U.S. at 243-45); *see also Wagner*, 989 F.2d at 73 ("Even where an informant has no proven record, if an informant's declaration is corroborated in material respects, the entire account may be credited, including parts without corroboration.").  Finally, "[t]he fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause."  *Panetta*, 460 F.3d at 395 (citing *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985)).

Here, the informant was a non-participant whose veracity and basis of knowledge were untested, but who appeared in person and gave her account voluntarily, without being coaxed by law enforcement.[5]  After speaking with CW-1, the government launched an extensive investigation to determine whether the allegations were true.  Over the next eighteen months, over two-dozen grand jury subpoenas issued for billing and bank records, and other relevant documents.  During that period, the government recorded numerous conversations between CW-1, Faux and Faux's patients in which CW-1 deliberately attempted to elicit incriminating information about Faux's billing practices.  An undercover agent also visited Faux's physical therapy practice in an attempt to corroborate CW-1's account and uncover additional evidence, though he did not see Faux for his physical therapy sessions or receive personal training.

The government's investigation did not reveal a smoking gun.  Faux did not incriminate herself during recorded conversations with CW-1, and CW-1's attempts to goad patients into revealing Faux's fraud generated responses that were ambiguous, at best.  Matching billing dates to personal training schedules did not yield much concrete evidence either.  Faux contends that patients often saw a trainer on the same day that she provided therapy, and excerpts of the recorded conversations provide at least some support for that assertion.  Thus, the fact that Faux

---

[5] Faux challenges CW-1's motivation for coming forward in order to attack CW-1's credibility.  *See* Mem. Supp. Omnibus Mots. 13.  CW-1's motives, however, are largely irrelevant, because the government did not treat CW-1's words as truth without undertaking significant attempts to corroborate her statements.

submitted insurance claims for physical therapy for many of the dates that patients received

training does not necessarily indicate fraud.[6]

Nonetheless, the government's investigation did turn up enough evidence to arrest or

indict Faux for Medicare fraud, i.e., probable cause existed to believe that Faux committed a

crime.  There were several dates for which Faux billed for physical therapy when it appears

likely that patients received only personal training.  Paragraph forty-eight of the search warrant

affidavit provides excerpts of a May 4, 2011 recorded conversation between CW-1 and an

individual identified as "Patient # 2."  In that conversation, Patient # 2 tells CW-1 that Faux

works with him on Mondays and Fridays and that he sees Faux's husband, Corwin, for personal

training on Wednesdays.  The affidavit then states that Medicare claims data showed that Faux

billed for physical therapy for Patient # 2 on April 6, 13, 20 and 27, 2011, all of which were

Wednesdays.

Similarly, paragraphs seventy, seventy-one and seventy-eight through eighty of the

affidavit include excerpts of recorded conversations between CW-1 and an individual identified

as "Patient # 1" on April 14, 2011 and May 20, 2011, respectively.[7]  In both conversations,

Patient # 1 indicates that she is not scheduled to see Faux during certain time periods and in both

---

[6] That does not mean that those aspects of government's investigation discredited CW-1's statements.  In *McColley*, a civil case that Faux cites at length, the Second Circuit held that "information that expressly fails to corroborate a confidential informant's account," like corroborating information, is "an aspect of the totality of the circumstances from which the credibility of a confidential informant can be assessed."  740 F.3d at 825.  In that case, the informant did not identify the plaintiff or even indicate that a woman would be present at the relevant property.  The government discovered that the plaintiff, a woman, lived at the property prior to applying for a warrant but omitted that information from its affidavit.  *Id.* at 821, 825.  Additionally, the government's affidavit excluded the fact that stationary and drive-by surveillance had "provided no evidence or suggestion" of narcotics or other criminal activity.  *Id.*  Those omissions impacted "the reliability of the overall information provided."  *Id.* at 826.  Here, by contrast, the government did not omit any such critical information contradicting CW-1's account.  CW-1 correctly identified Faux, the name and location of Achieve, and the key players involved.  Moreover, unlike narcotics or similar crimes, Faux's allegedly criminal conduct would not necessarily have been observable through surveillance.  And, as discussed, examination of her records did point to several instances where it appeared Faux billed for physical therapy on dates when patients likely received only personal training.  The government included those instances, as well as numerous others, in its affidavit.

[7] Faux submitted audio of the May 20, 2011 conversation to the court and I have listened to the relevant portions.

instances Faux not only billed Medicare for physical therapy services during those periods, she billed for dates when Patient # 1 received personal training with CW-1.  Faux asserts that Patient # 1 often changed her appointment dates, but "[t]he fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause."  *Panetta*, 460 F.3d at 395.

The government's investigation also corroborated some of the potentially innocent details that CW-1 provided, including the identities of the trainers to whom Faux would refer physical therapy patients and Faux's understanding that billing insurance for personal training services was not legal.  The inclusion of innocent details added significant length to the affidavit without bolstering the case against Faux, but corroboration of the innocent details provided by CW-1 does bear on her reliability.  *See Gagnon*, 373 F.3d at 235.  Because the government was able to corroborate some of CW-1's assertions, it is possible to credit additional statements about which CW-1 had personal knowledge.  And, even if CW-1 was not reliable, the abovementioned facts taken from billing records and recorded conversations are sufficient to establish probable cause that Faux at least occasionally billed Medicare for physical therapy when patients received only personal training.

2.   Franks *Hearing*

Faux asserts that she is entitled to a *Franks* hearing, because the government materially misrepresented some of the information in the affidavit supporting its application for the search warrants and wrongfully omitted other information – including exculpatory information – from the affidavit.  Faux argues that those misrepresentations and omissions misled Judge Fitzsimmons and caused her to improperly conclude that there was probable cause to issue the warrants.

14

A "presumption of validity" attaches to an affidavit supporting an application for a search warrant. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). In certain circumstances, however, "a defendant is entitled to a hearing to test the veracity of the affiant's statements." *Falso*, 544 F.3d at 125 (citing *Franks*, 438 U.S. at 171). If a defendant "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth," was included in the affidavit, and "the allegedly false statement is necessary to the finding of probable cause," then "the Fourth Amendment requires that a hearing be held at the defendant's request." *Franks*, 438 U.S. at 155-56.

The defendant's "attack must be more than conclusory" and the allegations "must be accompanied by an offer of proof." *Id*. at 171. In requesting a hearing, the defendant should "point out specifically the portion of the warrant affidavit that is claimed to be false," furnishing sworn affidavits "or otherwise reliable statements of witnesses," if possible. If sworn statements are not provided, then "their absence must be satisfactorily explained." *Id.*

Even if the defendant launches a proper attack, she is not entitled to a hearing unless the affidavit's remaining content, excluding "material that is the subject of the alleged falsity or reckless disregard," is insufficient to support a finding of probable cause. *Id.* at 171-72. No hearing is required if "there remains sufficient content in the warrant affidavit to support a finding of probable cause." *Id.* at 172.

Faux asserts that the affidavit omitted numerous statements she made to CW-1 that indicate she was not committing Medicare fraud and omitted critical information regarding the billing records for one of the patients identified in the affidavit. Faux further contends that the government misrepresented conversations CW-1 had with patients by including isolated parts of

those conversations taken out of context, and omitting portions of the conversations that indicate that she was not committing fraud.

The inclusion of Faux's self-serving statements denying wrongful conduct would not have defeated a finding of probable cause. Faux's denials of wrongdoing may be presented as part of her defense at trial. And even if such statements would have impacted the probable-cause analysis, the affidavit includes enough of Faux's denials of wrongdoing and alternate explanations to have made her position abundantly clear to Judge Fitzsimmons.

The inclusion of the omitted patient statements would not have defeated a finding of probable cause either, because those statements primarily speak to Faux's character and the legitimacy of the patients' need for treatment. Faux presumably would have preferred that the affidavit included statements that made her look like a "good" and "honest" person, but a hearing is not required to draw out those sentiments. The only identified statements that relate to Faux's billing practices are contained in a conversation between CW-1 and Patient #2 in which CW-1 is skeptical that Faux would treat patients not covered by insurance and Patient #2 disagrees. In that conversation, Patient #2 also states that Faux has provided him with free services in the past and that he is aware of her doing so for another patient as well. But Faux might be fraudulently billing for personal training sessions whether or not she occasionally provided physical therapy services at no cost to some patients and permitted others to pay her out of pocket once their insurance ran out. Therefore, omission of those statements does not affect the probable cause analysis.

Faux's assertions about the omission of critical billing information, like her self-serving statements to CW-1 in the taped conversations, are simply part of her defense at trial. Faux's billing practices looked suspicious to McPhillips, who examined her records thoroughly. It may

be true, as Faux claims, that the discrepancies occurred for legitimate reasons – e.g., because Faux's elderly patients often cancelled their appointments.  But, as discussed above, "[t]he fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause."  *Panetta*, 460 F.3d at 395.  Even if McPhillips was incorrect as a matter of fact, there is nothing to suggest "deliberate falsity" or "reckless disregard for the truth."  *Franks*, 438 U.S. at 171 (noting that allegations of negligence or innocent mistake are insufficient).

In sum, none of the misrepresented or omitted information is necessary to a determination of probable cause.  As discussed above, the government's investigation uncovered several instances where Faux billed for physical therapy services on dates when personal training services were provided and physical therapy services likely were not.  The probable cause determination does not change even if the omitted information is included and the remainder of the affidavit is ignored; thus, Faux is not entitled to a *Franks* hearing.

B.  <u>Motion to Suppress Statements Made During the December 8, 2011 Interrogation</u>

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that the Fifth Amendment's privilege against self-incrimination applies in the setting of a custodial interrogation.  The police may not interrogate a suspect who "has been taken into custody or otherwise deprived of [her] freedom of action in any significant way," without first advising her that she has the right to remain silent, that anything she says can be used against her in a court of law, and that she has the right to the presence of an attorney during questioning and the right to have an attorney appointed if she cannot afford one.  *Id.* at 444, 479.  *Miranda* prohibits the government from using statements made by the defendant during a custodial interrogation in its case in chief, unless the defendant was properly warned and voluntarily waived the privilege.  *United States v. Newton*, 369 F.3d 659, 668 (2d Cir. 2004).

17

"*Miranda* applies only if two preconditions exist; namely, custody and interrogation." *United States v. McFarland*, 424 F. Supp. 2d 427, 440 (N.D.N.Y. 2006) (citing *Thompson v. Keohane*, 516 U.S. 99, 102 (1995)). "Absent either, non-*Mirandized* statements are admissible unless they are otherwise coerced under due process standards."[8] *Id.* The defendant bears the initial burden of demonstrating that she was subject to custodial interrogation. *United States v. Pena*, 961 F.2d 333, 338 (2d Cir. 1992). After the defendant makes the required showing, the burden shifts to the government to prove, by a preponderance of the evidence, the legality of the officers' actions. *United States v. Palase*, No. 11-CR-413 SLT, 2014 WL 6802560, at *4 (E.D.N.Y. Dec. 2, 2014) (citing *United States v. Miller*, 382 F. Supp. 2d 350, 362 (N.D.N.Y. 2005); *United States v. Burger*, 739 F.2d 805, 809 (2d Cir. 1984)).

Faux seeks suppression of statements that she made during the December 8, 2011 interrogation by McPhillips and Fontes, during the execution of the search warrant at her residence. The government concedes that Faux did not receive *Miranda* warnings before or during the two-hour session. It is also undisputed that the questioning constituted an "interrogation," because the agents expressly questioned Faux about potentially incriminating activities. *United States v. FNU LNU*, 653 F.3d 144, 148 (2d Cir. 2011) (citing *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980)). The motion to suppress turns on the issue whether Faux was "in custody" at the time she was questioned. Faux argues that she was, because she lacked freedom of movement in her home, which was swarming with law enforcement officers. The

---

[8] A defendant's incriminating statements are not coerced under the Fifth Amendment's Due Process Clause unless, under the totality of the circumstances, the conduct of "law enforcement officials was such as to overbear [the defendant's] will to resist," thereby rendering the confession involuntary. *Beckwith v. United States,* 425 U.S. 341, 348 (1976) (citing *Rogers v. Richmond*, 365 U.S. 534, 544 (1961)). "Factors to be considered in making a determination of voluntariness include, but are not limited to, the type and length of questioning, the defendant's physical and mental capabilities, and the government's method of interrogation," including whether it employed trickery or deceit in eliciting the incriminating response. *United States v. Mast*, 735 F.2d 745, 749 (2d Cir. 1984). There is no indication that the tactics employed by law enforcement rendered Faux's statements involuntary and Faux does not challenge the admission of her statements into evidence on due process grounds.

government contends that Faux was not in custody, because she was not arrested and her freedom of movement was not restricted to a degree commensurate with a formal arrest.

"'[C]ustody' for *Miranda* purposes is not coterminous with . . . the colloquial understanding of custody." *Id.* at 152-53.  Supreme Court precedent establishes that an individual may be stopped and questioned by the police, but still not be in "custody" for the purposes of *Miranda*.  *See, e.g.*, *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (interrogation during traffic stop was not custodial, even though individual was not free to terminate the encounter).  The test for determining "custody" is an objective inquiry that asks: (1) "whether a reasonable person would have thought [she] was free to leave" the police encounter; and (2) if not, "whether [her] freedom of action has been curtailed to a degree associated with formal arrest." *Newton*, 369 F.3d at 671-72 (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983); *Stansbury v. California*, 511 U.S. 318, 322 (1994)).

Although both elements are required, the second is the "ultimate inquiry" of the "custody" analysis.  *Newton*, 369 F.3d at 670.  That is because "a free-to-leave inquiry reveals only whether the person questioned was seized" and not all seizures amount to "custody."[9] *Id.* at 672; *see also United States v. Zaleski*, 559 F. Supp. 2d 178, 189 (D. Conn. 2008); *United States v. Kim*, 292 F.3d 969, 976 (9th Cir. 2002) ("[W]hether an individual detained during the execution of a search warrant has been unreasonably seized for Fourth Amendment purposes and whether that individual is 'in custody' for *Miranda* purposes are two different issues.").  Seizure is a necessary prerequisite to the determination of custody, but it is not sufficient.  *Id.*  A person

---

[9] It is equally well settled that "[a] person can be lawfully 'seized' but not 'arrested' under the Fourth Amendment, while they are *simultaneously* 'in custody' for Fifth Amendment *Miranda* purposes." *United States v. Fautz*, 812 F. Supp. 2d 570, 615 (D.N.J. 2011).  "Although some detentions not rising to the level of a formal arrest may be reasonable within the meaning of the Fourth Amendment, those same detentions may nonetheless create the custodial situation in which *Miranda* was designed to operate." *Id.* (citing *United States v. Revels*, 510 F.3d 1269, 1274 (10th Cir. 2007)).

is not "'in custody for practical purposes,' and 'entitled to the full panoply of protections prescribed by *Miranda*,'" unless she both has been seized and has had her "freedom curtailed to a degree associated with formal arrest." *Newton*, 369 F.3d at 672 (quoting *Berkemer*, 468 U.S. at 440).

The individual's beliefs about her status and the officer's perceptions of the same do not bear on the "custody" analysis, except to the extent that the officer's suspicions are "communicated or otherwise manifested" in a way that "would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." *Stansbury*, 511 U.S. at 324-25 (internal citations and quotation marks omitted); *see also United States v. Falso*, 293 F. App'x 838, 839 (2d Cir. 2008) (citing *Stansbury*).  An individual could reasonably deem her situation comparable to a formal arrest where she understands that her detention is "not likely to be temporary and brief" and feels herself to be "completely at the mercy of the police." *Newton*, 369 F.3d at 675 (citing *Berkemer*, 468 U.S. at 440); *see also United States v. Cohen*, 372 F. Supp. 2d 340, 348-50 (E.D.N.Y. 2005).  Relevant factors include: (1) "the interrogation's duration"; (2) "its location (e.g., at the suspect's home, in public, in a police station, or at the border)"; (3) "whether the suspect volunteered for the interview"; (4) "whether the officers used restraints"; (5) "whether weapons were present and especially whether they were drawn"; and (6) "whether officers told the suspect [she] was free to leave or under suspicion." *FNU LNU*, 653 F.3d at 153 (internal citations and alterations omitted).

An interrogation that occurs in an individual's home uniquely affects the custody analysis.  The home is "the most constitutionally protected place on earth"; thus, the right to terminate the interrogation and be "free to leave" is "hollow" if the one place that the individual cannot retreat to, or exclude law enforcement from, is her home.  *United States v. Craighead*,

539 F.3d 1073, 1082-83 (9th Cir. 2008).  Nevertheless, being questioned in a private,

constitutionally-protected place is viewed as a far cry from the typical custodial setting – the

police station or the back of a cruiser.  *See id.*  Absent a formal arrest, courts rarely conclude that

a suspect interrogated in her own home is "in custody."  *See, e.g.*, *United States v. Badmus*, 325

F.3d 133, 139 (2d Cir. 2003); *United States v. Mitchell*, 966 F.2d 92, 99 (2d Cir. 1992); *Falso*,

293 F. App'x at 839; *United States v. Schaefer*, 859 F. Supp. 2d 397, 411-12 (E.D.N.Y. 2012),

*aff'd*, 519 F. App'x 71 (2d Cir. 2013); *United States v. Berschansky*, 958 F. Supp. 2d 354, 382-

83 (E.D.N.Y. 2013); *United States v. Groezinger*, 625 F. Supp. 2d 145, 158 (S.D.N.Y. 2009).

Under certain circumstances, however, the home may be transformed into a custodial

setting.  *See, e.g.*, *Orozco v. Texas*, 394 U.S. 324, 325 (1969) (defendant in custody where four

officers entered his bedroom at 4:00 a.m. and questioned him without providing warnings);

*Newton*, 369 F.3d at 676-77 (defendant in custody where questioned at home in handcuffs);

*United States v. Ortiz*, 943 F. Supp. 2d 447, 455-56 (S.D.N.Y. 2013) (defendant in custody

where officers threatened to arrest everyone in apartment unless information was provided);

*Craighead*, 539 F.3d at 1084-89 (defendant in custody where questioned in closed-door room, in

police-dominated home, with armed law enforcement blocking exit).

All factors should be weighed and no one factor is dispositive, but certain circumstances

tend to make an individual reasonably feel that she is "completely at the mercy of the police"

and, thus, significantly impact the custody analysis.  *Newton*, 369 F.3d at 675 (citing *Berkemer*,

468 U.S. at 440); *United States v. Griffin*, 922 F.2d 1343, 1354-55 (8th Cir. 1990) ("Questioning

which occurs in the suspect's own home may provide a margin of comfort, but . . . the setting of

the interrogation is not so important to the inquiry as the question of police domination of that

setting.").  Handcuffs, "a hallmark of a formal arrest," are strongly suggestive of custody where

the individual lacks reason to believe that she will be handcuffed only for the duration of a

search.  *See Newton*, 369 F.3d at 676-77.  Drawn weapons, raised voices and verbal threats

likewise are indicia of custody.  *See id.*  Restricting the individual's movements in her home may

also indicate custody if the individual is not informed that the rationale for doing so is officer

safety and/or preservation of evidence.  *See Craighead*, 539 F.3d at 1085-86; *Griffin*, 922 F.3d at

1354.  Isolating the individual from her family or others who might provide emotional support

points toward custody as well.  *See id*; *United States v. Montalvo*, No. 11-CR-00366-RJA-JJM,

2014 WL 3894374, at *6 (W.D.N.Y. Apr. 16, 2014), *report and recommendation adopted*, No.

11-CR-366-A, 2014 WL 3894383 (W.D.N.Y. Aug. 8, 2014); *United States v. Revels*, 510 F.3d

1269, 1276 (10th Cir. 2007); *United States v. Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007); *cf.*

*United States v. Pollaro*, 733 F. Supp. 2d 364, 371 (E.D.N.Y. 2010) (defendant not in custody

where he and his wife were permitted to go about their morning routine and were not kept apart

during interrogation).  Finally, the mere fact that the individual's home is overrun with law

enforcement officials may also bear on custody, particularly where the individual would not

reasonably comprehend why so many officers were present.  *Compare, e.g.*, *Craighead*, 539 F.3d

at 1085-86 (presence of eight law enforcement officers from three different agencies in

defendant's home increased custodial nature of interview), *with Newton*, 369 F.3d at 675 (six

officers not surprising where defendant was parolee used to answering questions and knew some

of the officers).

      Conversely, informing the individual from the outset that she is not required to answer

questions, that she is not under arrest or suspicion, and/or that she is free to leave or will be after

the search are mitigating statements that carry significant weight in the custody analysis.  *See*

*Berschansky*, 958 F. Supp. 2d at 382-83; *Groezinger*, 625 F. Supp. 2d at 158; *United States v.*

*Pattee*, No. 12-CR-6183-PFG, 2013 WL 6579066, at *3 (W.D.N.Y. Dec. 13, 2013); *United States v. Lifshitz*, No. 03 CR. 572 (LAP), 2004 WL 2072468, at *6-7 (S.D.N.Y. Sept. 15, 2004). The individual's decision to voluntarily permit law enforcement into her home and willingness to engage in conversation also weigh against a finding of custody. *See id.*; *Badmus*, 325 F.3d at 139.

Although there are factors pointing in both directions, after considering the totality of the circumstances, I find Faux was in custody during the interrogation. Several mitigating factors weigh against a finding of custody in this case. Faux was questioned in the "familiar surroundings" of her home, was not handcuffed during the interrogation, and was not arrested at its conclusion. McPhillips and Fontes did not display their weapons or otherwise threaten physical force. Faux was never told that she was not free to leave, and there is no indication that she asked to terminate the interrogation, to leave the residence, or to be questioned in the same room as her husband. And, the tone of the questioning was largely conversational; there is no indication that McPhillips or Fontes raised their voices or made threatening statements in order to elicit responses to their questions. *See, e.g.*, *Falso*, 293 F. App'x at 839; *Berschansky*, 958 F. Supp. 2d at 382-83; *Groezinger*, 625 F. Supp. 2d at 158.

Yet, there are numerous aggravating factors that, in combination, distinguish this case from others where courts in this Circuit have held that an interrogation was not custodial. First, Faux was interrogated while about a dozen agents from three federal agencies executed a search warrant at her home. Faux did not invite a couple of officers into her home for a friendly chat; she was compelled to admit the officers in numbers they chose. Moreover, Faux's affidavit indicates that she knew or believed that the agents were armed. This is a documents case, not one involving weapons, drugs or other contraband, or a dangerous suspect. A reasonable person

would not expect that so many armed officers would be needed to execute a search.  The presence of a dozen armed officers would have been intimidating and would have communicated a show of force to a reasonable person, even if weapons were not drawn.  *Cf. Newton*, 369 F.3d at 675 (presence of six officers would not "by itself, have led a reasonable person in [defendant's] shoes to conclude that he was in custody," because "[a]s a parolee, [defendant] was accustomed to parole officers coming to his home to ask questions," and defendant recognized some of the officers present during search).

Second, Faux was physically separated from her husband, who was questioned by agents in another room.  Although the agents testified that they would have accommodated a request by Faux to see Corwin, they did not communicate that to Faux.  Without that information, Faux had no reason to believe that she would be allowed to see Corwin when the agents had intentionally separated them from each other for questioning.  Thus, Faux effectively was denied the comfort, support and advice of her husband during the interrogation.

Third, Faux was not permitted to move freely in her home during the two-hour interrogation; agents accompanied her to the bathroom and to her bedroom to obtain a sweater.  But unlike Corwin, who was told to remain in one place during the search for his own and the agents' safety, Faux was never informed that the rationale for restricting her movements was officer safety.  *See* Faux. Aff. ¶¶ 8-11; Hr'g Tr. 22, 39, 59.  Faux would have had no reason to believe the officers were concerned about their safety in her home.  Importantly, the officers had no rational basis for believing Faux or Corwin would harm them or would flee – indeed, if the couple were truly free to leave there was no legitimate concern of flight whatsoever.[10]  A

---

[10] Under *Michigan v. Summers*, 452 U.S. 692 (1981), law enforcement officials are permitted to detain occupants of a residence during the execution of a search warrant.  *Summers* "recognized three important law enforcement interests that, taken together, justify the detention of an occupant who is on the premises during the execution of a search warrant: officer safety, facilitating the completion of the search, and preventing flight."  *Bailey v. United*

reasonable person in Faux's situation, who has no prior criminal record or history of violent conduct, would have understood this restriction as a marker of custody.  *Compare, e.g.*, *Griffin*, 922 F.3d at 1354 (defendant in custody where officers accompanied him around house and required him to remain in sight without explaining that monitoring was for officer-safety purposes), *with Lifshitz*, 2004 WL 2072468, at *2, 7-8 (defendant not in custody where officers asked defendant not to move around for safety reasons).

Fourth, unlike the majority of cases involving noncustodial interrogations, Faux was never told that she was free to leave or that she had a choice whether to respond to questioning. McPhillips did not even tell Faux that she was not in custody until twenty minutes into the interrogation.  Hr'g Tr. 15, 23, 30, 35, 68; *cf., e.g.*, *Badmus*, 325 F.3d at 139 (officers immediately told defendant that they were "guests" in his house, that he was not under arrest, and that he could ask them to leave at any time); *Bershchansky*, 958 F. Supp. 2d at 382-83 (officers informed defendant he was not under arrest at outset of search); *Groezinger*, 625 F. Supp. 2d at 158 (same); *Lifshitz*, 2004 WL 2072468, at * 6 (same).  Faux would have realized that she was under suspicion when the agents informed her why they were searching her home. Absent an explanation to the contrary, a reasonable lay person in her shoes could have felt that the search warrant required her not only to admit the officers and submit to a search but also to answer questions posed by the searching officers.  Thus, an agent informing her that she was not in custody and/or that she was free to leave at the outset of the search would have been particularly significant to a reasonable person's understanding that she was not in custody.

---

*States*, 133 S. Ct. 1031, 1038 (2013).  Although *Summers* permits the government to detain occupants of a residence during the execution of a search warrant, the rationales underlying its holding is not well applied in a case like this. Here, the agents were seizing computer and paper records, not contraband.  They had no cause to believe that the occupants of the house were armed and dangerous.  And, if Faux and Corwin truly were "free to leave" as the government argues they were, the agents had no reason at all to be concerned with flight.

Finally, Faux and Corwin had somewhere to be when the agents arrived at their home. Although the sun was just coming up, they were already dressed and ready to leave, because they were on their way to the airport for vacation with Corwin's son and his family. That mitigates the early hour of the interview, but it significantly increases the coercive nature of the interrogation. Faux asserts that when she informed the agents of her vacation plans, McPhillips told her she was "not going anywhere." Faux Aff. ¶ 6. Whether or not McPhillips made that statement, that is the message that would have been communicated to a reasonable person in Faux's situation. It is impossible to believe that Faux voluntarily chose to answer questions for two hours rather than choosing to go on a vacation with relatives – particularly when she had no means to tell the others traveling that the vacation had been interrupted. No reasonable person would submit to the inconvenience and expense of missing a flight and cancelling a vacation to be taken with others if she thought she had the choice of answering questions at another time. Significantly, when Faux informed Corwin that they would have to cancel their vacation, the agents never corrected her. Instead, they asked her questions for two hours. *Cf. Groezinger*, 625 F. Supp. 2d at 158 (agents informed defendant he was going to be late for court appearance, indicating he would be free to leave once the search was completed). Faux clearly did not feel free to terminate the police encounter in question, and that feeling was objectively reasonable.

Under the totality of the circumstances presented here, a reasonable person in Faux's situation also would have understood her freedom of action to be "curtailed to a 'degree associated with a formal arrest.'" *Berkemer*, 468 U.S. at 440 (quoting *Beheler*, 463 U.S. at 1125); *Newton*, 369 F.3d at 671 (citing *Berkemer*). Accordingly, I find that Faux was in "custody" during the interrogation at her home. Because Faux did not receive *Miranda* warnings, the motion to suppress statements she made during that interrogation is granted.

26

### III. Conclusion

For the foregoing reasons, the motion to suppress evidence and request for a *Franks* hearing (doc. # 37) is denied and the motion to suppress statements (doc. # 58) is granted.  It is so ordered.

### IV. Comment on the Government's Conduct

The basis for my ruling on the motions to suppress is set forth in full above.  What follows is an afterword to that ruling that comments on a routine government practice that I believe is unfair and that should be held to violate the constitutional protections afforded to criminal suspects.

Faux was the sole subject of an eighteen-month, targeted investigation.  By the time she was interrogated, a grand jury had been issuing subpoenas for her bank and billing records for over a year.  A confidential informant working for the government had recorded countless hours of conversations with Faux in an effort to obtain admissions from her and the government had sent an undercover agent to snoop around at Faux's business to uncover additional evidence of wrongdoing.  The goal of these sustained efforts was not to investigate *who* was committing a crime, but rather to prove that *Faux* was committing a crime.  Indeed, if a crime had been committed, Faux is the *only* person who could have committed it.

The fruits of the government's investigation enabled it to obtain a judicial determination of probable cause the very day before the interrogation of Faux.  Although the government did not seek a warrant for Faux's arrest at that time, McPhillips' search warrant affidavit established probable cause that evidence of a crime would be found at Faux's home and business – and probable cause supporting a search warrant could exist only if there was probable cause to believe that Faux had committed a crime.  (This is not a situation, for example, in which Faux's home was believed to be a stash house for someone else's Medicare billing records).  In

questioning her that morning, the government was not looking for a suspect; it was simply trying to make its case easier to prove at trial by pressuring her into a confession.

At the very least, it was truly unfair for the government to interrogate Faux without telling her that she was targeted for indictment.  The government should be commended for the success of its investigation, but that very success should impose prudential limits on the government's interrogation of a person it had all but formally accused of a crime.  In order to avoid "the appearance of unfairness," the Department of Justice has a "longstanding policy to advise grand jury witnesses who are known 'targets' of the investigation that their conduct is being investigated for possible violation of Federal criminal law."  United States Attorneys' Manual §§ 9-11.150, 151.  In addition to being informed of their "target" status, such witnesses are told that they have a right to refuse to answer potentially incriminating questions, that anything they say may be used against them by the grand jury or in a subsequent legal proceeding, and that they have the right to consult with retained counsel.  *Id.*

That policy should have been followed in this case even though the interrogation occurred outside the grand jury room.  Faux was certainly a "target," i.e., "a person as to whom the prosecutor or the grand jury has substantial evidence linking him or her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant."  *Id.*  Under these circumstances, it was unjust for the government not to advise Faux of her rights to remain silent and to have counsel present during the questioning at her home.

I further believe that the interrogation of a target during the execution of a search warrant should be unconstitutional unless the target is advised of her rights.  The Fifth Amendment ought to apply, and *Miranda* warnings should be required, once "the adversary process has begun, i.e., when the investigative machinery of the government is directed toward the ultimate conviction

of a particular individual." *Beckwith v. United States*, 425 U.S. 341, 350 (1976) (Brennan, J., dissenting) (quoting *United States v. Oliver*, 505 F.2d 301, 304-05 (7th Cir. 1974)).  As discussed above, the Supreme Court has confined *Miranda*'s holding to custodial interrogation. *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) ("*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'").  Yet, the "custody" analysis required by the current state of the law ignores the fundamental difference between the questioning of a mere witness or potential suspect and "the interrogation of an accused for the purpose of securing [her] conviction."  *Beckwith*, 425 U.S. at 350 (Brennan, J., dissenting).

In my view, there are two fundamental ways in which the power of government can be brought to bear on an individual in the criminal investigatory process: one can be held in custody and one can be a putative defendant the government intends to prosecute.  At present, constitutional law protects the former, but not the latter; yet both exercises of government power should give rise to constitutional protections.  This should be accomplished either by extending *Miranda* to noncustodial interrogation of targets or by recognizing Sixth Amendment rights for targets of a criminal investigation.

The current state of the law leaves a huge loophole in the constitutional protections afforded criminal suspects – and the government routinely exploits that loophole by carefully planned interrogations during executions of search warrants.  The government well knows that the Fifth Amendment will not apply, so long as the interrogation can be described as noncustodial, and that the Sixth Amendment right to counsel will not kick in until the government decides to *formally* charge the individual it has targeted for indictment.  *See, e.g.*, *Kirby v. Illinois*, 406 U.S. 682, 688 (1972) ("[I]t has been firmly established that a person's Sixth

and Fourteenth Amendment right to counsel attaches only at or after the time that adversary

judicial proceedings have been initiated against him."); *United States v. Mandujano*, 425 U.S.

564, 579-83 (1976) (target of grand jury proceedings has no constitutional right to counsel,

because witness has yet to be formally charged and is not in custody for *Miranda* purposes).

By the time an individual becomes a target, that is a "putative defendant," the

government generally has all of the information it needs to arrest or indict, but it can choose not

to do so before questioning, thereby preventing the target's Sixth Amendment rights from

attaching.  Agents can wait until they have probable cause to obtain a search warrant and then

conduct a planned interrogation of the suspect under the guise of executing the warrant.  The

agents assigned to interrogate the target can wear street clothes and keep their weapons hidden,

in hopes of minimizing the risk a court will find the suspect was in custody.  Meanwhile, a

multitude of agents can swarm the scene, unsettling the target and putting pressure on her to talk.

It is true that "[a]ny interview of one suspected of a crime by a police officer will have

coercive aspects to it, simply by virtue of the fact that the police officer is part of a law

enforcement system which may ultimately cause the suspect to be charged with a crime."

*Mathiason*, 429 U.S. at 495.  But the government's practice of conducting interrogations during

the execution of a search warrant is designed to manufacture coercion in fact that will not be

recognized as coercion under the law.

Questioning an individual targeted for indictment during the execution of a search

warrant at her home without advising her of her rights is wrongful conduct that should not be

condoned, either ethically or constitutionally.  Courts should stop turning a blind eye to the

reality that this practice can render the questioning a coercive, custodial interrogation.  Any

interrogation of a target, whether or not "custodial" as defined by current case law, should occur

only after a waiver of rights.  Once the adversary process has begun and the "investigative machinery of the government is directed toward the ultimate conviction of a particular individual," *Beckwith*, 425 U.S. at 350 (Brennan, J., dissenting), that individual deserves the constitutional protection of *Miranda* warnings.

This comment can do nothing to change the state of the law, but I hope it helps bring about a change in law enforcement practice.

Dated at Bridgeport, Connecticut, this 24th day of March 2015.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge